**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JEANNE HEDGEPETH, | |
| Plaintiff, | |
| v. | No. 21 CV 3790 |
| JAMES A. BRITTON, KIMBERLY CAVILL, ANNA KLIMKOWICZ, ROBERT J. LEFEVRE, JR., STEVEN ROSENBLUM, LISA A. SMALL, EDWARD M. YUNG, and TOWNSHIP HIGH SCHOOL DISTRICT 211, | Judge Manish S. Shah |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Jeanne Hedgepeth, a high school social studies teacher, wrote a series of Facebook posts in response to the George Floyd protests. After receiving emails and calls about the posts, the school district initiated an investigation, determined that Hedgepeth had violated district policies, and dismissed her. Hedgepeth requested a hearing before the Illinois State Board of Education. Based on the hearing officer's findings and recommendation for her dismissal, the school district dismissed Hedgepeth for cause. She did not seek judicial review of the dismissal in a circuit court. Hedgepeth brings this suit against Township High School District 211, its Board Members, Superintendent Lisa Small, and Human Resources Director James Britton under 42 U.S.C § 1983 alleging that defendants violated Hedgepeth's First Amendment rights when they dismissed her. Defendants move for summary judgment on claim and issue preclusion as well as on the First Amendment claim.

Plaintiff moves for summary judgment only as to the preclusion defense. For reasons discussed below, defendants' motion for summary judgment is granted and plaintiff's motion for summary judgment is denied.

## I.    Legal Standards

A motion for summary judgment may be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party … [and] [t]he substantive law of the dispute determines which facts are material." *Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022) (internal citations omitted). I view all the facts and draw reasonable inferences in favor of the non-moving party to determine whether summary judgment is appropriate. *See Uebelacker v. Rock Energy Coop.*, 54 F.4th 1008, 1010 (7th Cir. 2022). These standards apply equally to cross-motions for summary judgment, *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017), and I consider evidence from both motions to ensure that there is no material dispute. *Torry v. City of Chicago*, 932 F.3d 579, 584 (7th Cir. 2019).

## II.    Background

### A.    Hedgepeth's Disciplinary History

Hedgepeth worked for twenty years as a social studies teacher at Palatine High School until her dismissal in 2020. [67] ¶ 1; [69] ¶ 4.[1] Hedgepeth was disciplined twice before her termination.[2] Hedgepeth's first suspension in 2016 occurred after she presented a lecture about the presidential election results during which she used phrases like "f-ing lie" and "fricking deported." [54-2] at 199. She was suspended without pay for one day for using inappropriate language in violation of district policies and was warned that similar incidents would result in additional disciplinary measures and possible termination. [54-2] at 200. Hedgepeth's second suspension in 2019 involved an exchange with a student where she told them, among other things, "You haven't even done your fucking homework." [54-2] at 202. The District

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. The facts are largely taken from the parties' responses to Local Rule 56.1 statements where both the asserted fact and the opposing party's response are set forth in one document. *See* [67], [69], [78]. Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). Because I did not give plaintiff permission to file a reply brief in support of her cross-motion, she did not have the opportunity to respond to defendants' Local Rule 56.1(b)(3) statement of additional facts. [67] at 6–8. Those facts assert the content of public records, and I take judicial notice of them. *Id.* No response is necessary. I disregard all immaterial facts. *See, e.g*, [78] ¶¶ 15, 24, 29–32, 48, 53. General objections to how facts are characterized, *see* [69] ¶¶ 12–19, 49–50, 55, 57, 63, 68, 74–77 *and* [78] ¶¶ 5–6, 12–13, 52, are sustained and I omit the characterizations and cite to the original language when possible. Where the parties dispute facts and both rely on admissible evidence, I include both sides' versions, understanding that the nonmovant is entitled to favorable inferences.

[2] Hedgepeth asserts that her suspensions are only relevant to the defendants' preclusion defense. But plaintiff's history of suspensions and in particular, the Notice to Remedy issued in 2019, were relevant to her dismissal proceedings and informed the Board's decision. Both parties dispute the characterization of the prior disciplinary proceedings, *see* [78] ¶¶ 33–34, so I cite to the Conference Summaries, [54-2] at 199–208, for the purpose of explaining what the Board considered.

suspended her without pay for four days, issued a Notice to Remedy, and required Hedgepeth to attend six counselor or therapy sessions. [54-2] at 204, 206–08.

## B. Facebook Posts

On June 1, 2020, in the midst of the unrest following George Floyd's death, Hedgepeth took to Facebook. [67] ¶ 1; [69] ¶¶ 20–21. In response to news about incidents of rioting and looting, Hedgepeth posted photos from her vacation with the caption, "I don't want to go home tomorrow. Now that the civil war has begun I want to move." [69] ¶ 21. A Facebook friend responded to her post, "Follow your gut! Move!!!!!!!!" to which Hedgepeth replied, "I need a gun and training." [69] ¶ 21. Hedgepeth also reposted a meme that said "Wanna stop the Riots? Mobilize the septic tank trucks, put a pressure cannon on em… hose em down… the end." [69] ¶ 22. She added, "You think this would work?" [69] ¶ 22. Hedgepeth's third post was an exchange via Facebook comments with a former student where she responded in one part, "I find the term 'white privilege' as racist as the 'N' word."[3] [69] ¶ 23; [78] ¶ 12.

---

[3] Hedgepeth argues that the full conversation with the former student is no longer available and offers her declaration to establish what was said between them. [69-1] ¶¶ 8–10; [78] ¶¶ 12–14. Defendants object that Hedgepeth's characterization is not supported by admissible evidence. Hedgepeth's assertions about what the former student said are not offered for the truth of the matters asserted, but for their effect on Hedgepeth, who has personal knowledge of this exchange. I accept her assertion that the comment was a part of a longer conversation, but I find it immaterial because the Board only acted on what was known to them. The comment before the Board stated, "I am about facts, truth seeking and love. I will speak on any topic I choose because I live in a free country. I find the term 'white privilege' as racist as the 'N' word. You have not walked in my shoes either so do not make assumptions about me and my so called privilege. You think America is racist? Then you have been hoodwinked by the white liberal establishment and race baiters like Jesse Jackson and Al Sharpton. Travel the world and go see that every nation has racism and some more than others but few make efforts such as we do to mitigate or eliminate it. I have lived and seen[.] The people I am informed by about the black experience in America are actually some of the smartest people in America [a]nd it so happens they are black. Ii (sic) highly

By the next day, school principal Tony Medina began receiving messages about Hedgepeth's posts, which were relayed to Superintendent Lisa Small. [69] ¶ 24. The District also began receiving emails, calls, and media outlet inquiries.[4] [69] ¶¶ 27–

recommend studying Thomas Sowell who is now retired and in his 80's. A treasure. A truth seeker, does REAL research and analysis. Candace Owens is one of the smartest and most courageous women in America and Larry Elders speaks the truth with a great sense of humor and FACTS not feelings. They are who I listen to when it comes to facts about the black experience in America. Don't you think there is a deeper problem than racism when 50% of murders in America are committed by 13% of the population? Do you think there might be a subtle genocide of black babies when most planned parenthoods are put in poor neighborhood and that 33% of abortions are black babies, black women only make up 7% of the U.S. population. The greatest power you have is what you believe about yourself, what have Democrats, mainstream media and intellectuals in ivory towers been telling the black community to believe about themselves for forty years? Wake up and stop believing them, then things will change." [69] ¶ 23.

[4] Hedgepeth raises several objections to the defendants' characterization of the volume and nature of the communications received by the District. [69] ¶¶ 27–28, 48. Plaintiff objects to defendants' tally of communications received by Superintendent Small, but Small's testimony is supported by her personal knowledge of communications that were forwarded to her. [54-2] at 479–81; *see* Fed. R. Evid. 602. Her affidavit is itself evidence and does not require additional support. *See* Fed. R. Civ. P. 56(c)(4); *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020) (A party may use an affidavit to oppose a motion for summary judgment where "the affidavit (1) attests to facts of which the affiant has personal knowledge; (2) sets out facts that would be admissible in evidence; and (3) shows that the affiant or declarant is competent to testify on the matters stated") (cleaned up). These communications are not hearsay because they are not offered for the truth of the matters asserted, other than as statements of present sense impressions; they are offered for evidence of their effect on the Board. *See* Fed. R. Evid. 803(1). For the same reasons, I overrule plaintiff's objections to Principal Medina's statements about communications he received and his personal opinion on plaintiff's fitness as a teacher. *See* [69] ¶¶ 45–47. Plaintiff offers the Alymer declaration to dispute defendants' characterization of the emails received by the District and the public comments received for the June school board meeting. [69-7] at 68–73. Ultimately, this dispute between the parties is immaterial. By plaintiff's own analysis of the communications, the District received 113 emails related to her speech and 76 comments submitted for the June board meeting. [69-7] at 68–73. I accept for purposes of summary judgment an inference in Hedgepeth's favor that some communications were supportive of her, some emails were based on template forms, and many communications were submitted by members of the public rather than students and parents. *See* [69-7] at 68–73. Even under plaintiff's analysis, however, there were communications from people critical of her, including parents and students. [69-7] at 70–71. Plaintiff also objects to the online news articles offered by defendants. [69] ¶ 29. The news articles are not hearsay because they are not being offered for the truth of the matters asserted, but to prove the effect of media attention on the Board. Newspaper articles are self-authenticating and admissible. *See* Fed. R. Evid. 902(6).

28. In response, the District issued a press statement clarifying that Hedgepeth's posts "do not reflect the values or principles of District 211" and apologizing "for any harm or disrespect that this may have caused." [69] ¶ 29.

Later that week, Hedgepeth met with James Britton, the District's Human Resources Director. Britton reviewed with Hedgepeth her prior disciplinary incidents, the Notice to Remedy she received in 2019, the emails and calls coming into the District about her posts, and provided her an opportunity to explain her statements. [69] ¶¶ 30–37. Britton advised her that an investigation would follow. [69] ¶ 25. Britton prepared a memorandum for Small recounting his investigation on Hedgepeth's conduct and meetings with her; he recommended that she be considered for dismissal. [54-2] at 561–66; [69] ¶ 49.

A week later, Small and Britton met with Hedgepeth to inform her that Small would be recommending that the Board dismiss Hedgepeth. [67] ¶ 2; [69] ¶ 40. Small's recommendation was based on Hedgepeth's prior disciplinary incidents, her Facebook posts, the public reaction and feedback that the District received, and her "lack of any understanding or appreciation for why many people found her comments objectionable." [54-2] at 481–82; [69] ¶ 53. Small concluded that Hedgepeth violated school district policies and could no longer effectively serve as a teacher and recommended her dismissal to the Board.[5]

---

[5] Small found that Hedgepeth's conduct violated four district policies: (1) Board Policy KA ("School-Community Relations Goals"), which requires district employees to exhibit and maintain "just and courteous professional relationships with pupils, parents, staff members and others"; (2) Board Policy GCA requiring teachers to "provide guidance to students which will promote welfare and proper educational development"; (3) Board Policy GBAD ("Social

The Board allowed public comment at two board meetings. At the June board meeting, at least 58 comments were submitted on the topic of the Facebook posts with some speakers expressing support and some expressing criticism. [69] ¶ 43; [69-7] at 71–72, 90–94. At the July board meeting, more speakers addressed the posts as well as issues of diversity and inclusion.[6] [69] ¶ 60; [69-7] at 110. During the closed portion of the July board meeting, the Board took into account Small's recommendation and provided an opportunity for Hedgepeth and her attorney to respond. [69] ¶ 58. The Board then voted to dismiss Hedgepeth. [67] ¶¶ 3–4; [69] ¶ 61.

The Board served Hedgepeth with the Notice of Charges, Bill of Particulars, and advised her of her right to request a hearing. [69] ¶ 62. The Bill of Particulars stated in part: (1) "The District has received over 135 emails and phone calls expressing concern or outrage about your posts. The communications came from former students, parents, current students and staff. Your postings also received media coverage, including on WGNTV, ABC7, NBC5, Fox 32, the New York Post and the Daily Herald" and (2) "Your position requires you to work with staff and students of all backgrounds and races. Your comments reveal your biases and are inconsistent

---

Media and Electronic Communication") requiring that "[a]ny duty-free use must not interfere with the employee's job duties or the school environment and warning that "[i]mproper use of personal technology, social media, or electronic communication for District- or school-related purposes or in a manner that is considered to have nexus to the District or school is subject to disciplinary action"; and (4) Board Policy AF of Compassion, Dignity and Respect that "values and honors the strength and diversity of all individuals." [54-2] at 178–79, 482.

[6] Hedgepeth disputes defendants' characterization of the public comments made at the July board meeting. [69] ¶ 60. The meeting minutes show that two speakers expressed support of Hedgepeth; two speakers addressed "concerning comments"; thirteen speakers addressed the topic of "equity and culture in District 211"; and two speakers addressed suspension data. [69-7] at 110.

with the values the District upholds. They injure and impede the efficiency of the District's provision of services. The District's student population and staff are diverse, and such racially charged language disrupts the provision of educational services. You have lost the trust and respect of colleagues and students." [54-2] at 593–94.

### C. State Board Hearing

Hedgepeth requested a dismissal hearing before a neutral hearing officer of the Illinois State Board of Education. [67] ¶ 5; [69] ¶ 62. The officer conducted the hearing on March 10 and April 9, 2021; Hedgepeth had the opportunity to call witnesses, offer documents into evidence, cross-examine witnesses, and present arguments. [69] ¶ 65.

On October 26, 2022, the hearing officer issued a report with findings of fact and recommendation.[7] [67] ¶ 9; [69] ¶ 67. The officer considered three issues: (1) whether Hedgepeth's Facebook posts violated the 2019 Notice to Remedy; (2) whether Hedgepeth engaged in conduct which constitutes irremediable cause for her dismissal; and (3) whether the Facebook posts were protected speech under the First Amendment. [54-2] at 620–21. Based on her findings of fact, the hearing officer determined that Hedgepeth's posts violated her Notice to Remedy issued in 2019. [54-

---

[7] Hedgepeth objects to the hearing officer's report on hearsay grounds and argues that it is only relevant as to the defendants' preclusion defenses. [69] ¶¶ 67–77. The report was a public report containing factual findings pursuant to an administrative hearing by an officer of the Illinois State Board of Education and plaintiff does not suggest that the circumstances indicate a lack of trustworthiness. *See* Fed. R. Evid. 803(8)(A)(iii)–(B). It is not excluded by the rule against hearsay. *Id.* I overrule plaintiff's objection to relevance for the same reason I overruled her objection to the conference reports—the hearing officer's findings and recommendation for dismissal were relevant to the school district's decision, and in turn, relevant to evaluating her First Amendment challenge to that decision.

2] at 631–33. Hedgepeth's conduct was irremediable because it "compromised, beyond repair… her ability to continue to function effectively in her role" and her posts "destroyed any possibility that she could be viewed as a fair and honest arbiter in the students' expressions of different perspectives." [54-2] at 634–35. The hearing officer applied the *Pickering* balancing test and found that Hedgepeth's First Amendment rights were not violated by her dismissal. [54-2] at 635–39; *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563 (1968). While Hedgepeth's posts touched on matters of public concern, the interest of the District in promoting the efficiency of its educational services to students outweighed her speech interests. [54-2] at 639.

The Board adopted the hearing officer's findings of fact and accepted the recommendation to dismiss Hedgepeth. [67] ¶ 10; [69] ¶ 78. The Board then approved a resolution and order dismissing Hedgepeth for cause on November 10, 2022. [67] ¶ 10; [69] ¶ 78. Hedgepeth did not seek judicial review of the Board's order in a circuit court. [67] ¶ 14; [69] ¶ 80. While the hearing officer's decision was pending, Hedgepeth filed this suit for violation of her First Amendment rights under 42 U.S.C. § 1983 on July 15, 2021.[8] [1].

---

[8] Hedgepeth also filed a lawsuit against Tim McGowan in the Circuit Court of Cook County alleging defamation and tortious interference with a contract on February 17, 2021. [67-1] at 43, 68–69. That court granted defendant McGowan's motion for summary judgment on June 26, 2023. [67-1] at 68–69. The court determined that Hedgepeth was dismissed for cause based on her own conduct, Hedgepeth did not appeal her dismissal under Illinois Agency Law, the determination by District 211 was final, and Hedgepeth was collaterally estopped from arguing that her dismissal was wrongful or based on alleged statements of McGowan. [67-1] at 68–69.

## III. Analysis

### A. Preclusion

Defendants argue that Hedgepeth's First Amendment claim is barred by both issue and claim preclusion. The law of the state of the judgment controls the preclusion analysis, so Illinois law applies here. *See Allen v. McCurry*, 449 U.S. 90, 96 (1980). I am required to give the same preclusive effect to a state court judgment as any Illinois court rendering judgment would give it. 28 U.S.C. § 1738; *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 373 (1996). But when there is no state court judgment, the federal common-law doctrine of preclusion applies. *See Univ. of Tennessee v. Elliott*, 478 U.S. 788, 799 (1986). Unreviewed state agency findings are entitled to the same preclusive effect that a state court would afford them so long as the agency was acting in a judicial capacity and resolved issues that the parties had an adequate opportunity to litigate.[9] *Id.* at 799.

Hedgepeth argues that the Board was acting in an "executive" rather than judicial capacity, so its judgment is not entitled to preclusive effect. [56] at 8. An agency acts in a judicial capacity if the proceeding involved adequate safeguards: "(1) representation by counsel, (2) pretrial discovery, (3) the opportunity to present

---

[9] Illinois courts grant both claim and issue preclusive effect to unreviewed state agency judgments that are "adjudicatory, judicial, or quasijudicial in nature." *Vill. of Bartonville v. Lopez*, 2017 IL 120643, ¶ 71–72. In federal courts, the preclusive effect of unreviewed agency decisions is limited to factfinding. *Allahar v. Zahora*, 59 F.3d 693, 696 (7th Cir. 1995). In this case, issue preclusion resolves the dispute, so I do not address the defendants' claim preclusion defense. [53] at 10–11; [66] at 11–14. And I do not address plaintiff's arguments that defendants acquiesced to claim-splitting, [56] at 12–13, because acquiescence is not relevant to issue preclusion. *See generally Rein v. David A. Noyes & Co.*, 665 N.E.2d 1199, 1207 (Ill. 1996) (citing to the Restatement (Second) of Judgments § 26 (1982) (discussing acquiescence in the context of claim preclusion)).

memoranda of law, (4) examinations and cross-examinations at the hearing, (5) the opportunity to introduce exhibits, (6) the chance to object to evidence at the hearing, and (7) final findings of fact and conclusions of law." *Reed v. AMAX Coal Co.*, 971 F.2d 1295, 1300 (7th Cir. 1992). Hedgepeth was afforded a full hearing with counsel, the opportunity to call witnesses, offer documents into evidence, cross-examine witnesses, and present arguments. [69] ¶ 65. The hearing officer issued findings of fact and recommendation for dismissal, which the Board adopted in full. [69] ¶ 78; [54-2] at 643–45. This is sufficient to establish that the Board acted in a judicial capacity.

Under Illinois law, issue preclusion, or collateral estoppel, applies if "(1) the issue decided in the prior adjudication is identical with the one presented in the suit in question, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication." *Gumma v. White*, 833 N.E.2d 834, 843 (Ill. 2005). A judgment is final for issue preclusion purposes when the possibility of appellate review has been exhausted. *In re A.W.*, 896 N.E.2d 316, 321 (Ill. 2008). Unlike claim preclusion, issue preclusion is limited to what was actually litigated and determined in an earlier proceeding. *See Gumma*, 833 N.E.2d at 843. There is no dispute that the third element is satisfied here.

One issue decided by the Board and the issue presented in this suit are identical—whether the Board violated Hedgepeth's First Amendment rights by dismissing her. [54-2] at 635–39. The third issue that the hearing officer explicitly

addressed was, "[w]hether Ms. Hedgepeth's Facebook posts at issue were protected speech pursuant to the First Amendment." [54-2] at 621. Based on her findings of fact, the hearing officer applied the *Pickering* test and determined that Hedgepeth's speech touched on matters of public concern, but the District's interest in promoting efficiency of providing educational services outweighed her speech interests. [54-2] at 635–40. And the determination of Hedgepeth's First Amendment defense was necessary to the Board's judgment of termination for cause, so the first element of issue preclusion is satisfied. [54-2] at 631.[10]

The Board's dismissal was a final judgment on the merits. The Illinois School Code governs the dismissal of tenured teachers. *See* 105 ILCS 5/24-12. A tenured teacher who is dismissed may request a full hearing before a neutral hearing officer through the Illinois State Board of Education. 105 ILCS 5/24-12(d)(1). After receiving the hearing officer's report with findings of fact and recommendation,[11] the school

---

[10] Hedgepeth's objection that the hearing officer could not hear her § 1983 claim for monetary damages does not defeat issue preclusion, which looks at the identity of issues. *See Mir v. State Farm Mut. Auto. Ins. Co.*, No. 1:19-CV-1225, 2020 WL 1265417, at *5 (C.D. Ill. Mar. 16, 2020), *aff'd*, 847 Fed. App'x 347 (7th Cir. 2021*)* ("A claim is essentially a remedy for a specified wrong, whereas an issue is a matter of law or fact determined by a prior proceeding."). As for claim preclusion, the difference in available remedies does not foreclose that defense either. *See Balcerzak v. City of Milwaukee, Wis.*, 163 F.3d 993, 997 (7th Cir. 1998) (rejecting litigant's argument that seeking a remedy under § 1983 in federal court defeats claim preclusion because the argument "if accepted, would undercut claim preclusion in every case where a constitutional issue was posed as a defense to a civil service commission or police board action"); *see also Abner v. Illinois Dep't of Transp.*, 674 F.3d 716, 720 (7th Cir. 2012) (applying Illinois law and finding claim preclusion barred federal suit where the proof required in the state administrative proceeding and federal § 1983 action was the same, the two suits arose from the same cause of action, and the state civil service commission could have heard the litigant's allegations of harassment and retaliation).

[11] The recommendation must address whether: "(i) the conduct at issue occurred, (ii) the conduct that did occur was remediable, and (iii) the proposed dismissal should be sustained." 105 ILCS 5/24-12(d)(8).

board is required to issue a written order either retaining or dismissing the teacher for cause. 105 ILCS 5/24-12(d)(8). The order must incorporate the officer's findings of fact, but the board may modify or supplement the findings of fact if they are against the manifest weight of the evidence. 105 ILCS 5/24-12(d)(8). The decision of the school board is final unless reviewed under the Administrative Review Law, which requires any action to review a final administrative decision to be filed within 35 days of service of the decision. *See* 105 ILCS 5/24-12(d)(8)–(d)(9), 5/24-16; 735 ILCS 5/3-102–103.[12]

Hedgepeth's failure to appeal the Board's decision under the Illinois School Code means that the Board's decision constituted a final judgment on the merits. After Hedgepeth's hearing and the officer's determination, the Board approved a resolution and order dismissing her for cause. [69] ¶ 78. This decision was final under Section 24-(d)(9) unless she filed an action for review in the circuit court within 35 days after she was served with the Board's decision on November 15, 2022. *See* 105 ILCS 5/24-12(d)(9), 5/24-16; 735 ILCS 5/3-102–03; [69] ¶ 79. She did not file an action for judicial review, so the Board's judgment is entitled to preclusive effect under Illinois law. [67] ¶ 14; [69] ¶ 80; *see also Vill. of Bartonville v. Lopez*, 2017 IL 120643, ¶ 51 (finding that preclusion barred defendants from relitigating a termination decision in arbitration proceedings where defendants failed to seek administrative review of the police board's termination of defendant officer). Hedgepeth argues that

---

[12] Section 5/24-16 provides that the Administrative Review Law applies to and governs proceedings for judicial review of a school board decision to dismiss for cause. 105 ILCS 5/24-16.

there was no circuit court review of the Board's decision, so there is no judgment to give preclusive effect to. [56] at 9. But there is no circuit court judgment because she did not seek review, and Hedgepeth cites no authority for the proposition that a litigant can evade finality by not appealing. *See Taylor v. City of Lawrenceburg*, 909 F.3d 177, 181 (7th Cir. 2018) (applying preclusion under Indiana law and finding a board's termination decision final even though the litigant withdrew appeal from judicial review).

All the requirements of issue preclusion are met here, but Illinois courts do not apply preclusion unless "it is clear that no unfairness results to the party being estopped." *Nowak v. St. Rita High Sch.*, 757 N.E.2d 471, 478 (Ill. 2001). Hedgepeth argues that giving preclusive effect to the defendants' dismissal would be unfair and prejudicial because defendants are "inherently conflicted" and cannot be the "final arbiters" of her federal civil rights claim against them. [56] at 11. But any prejudice to Hedgepeth by giving preclusive effect to the Board's dismissal is a consequence of her own choices. She had the right under Illinois law to file for administrative review with the circuit court if she believed the Board was biased and the judgment to be unfair. State court review provides the opportunity for a party to challenge an administrative decision for these reasons, but she opted not to do so.

Issue preclusion applies to facts resolved at the agency level, not conclusions of law. *See Allahar v. Zahora*, 59 F.3d 693, 696 (7th Cir. 1995). In some cases, giving issue-preclusive effect to an agency's findings of fact leaves little room for a contrary conclusion of law. *See, e.g.*, *Taylor*, F.3d at 181 (finding that issue preclusion barred

14

a First Amendment claim where the board's findings as to causation and improper bias in a termination decision precluded subsequent litigation). The result of the *Pickering* balancing test is a legal conclusion, but it contains predicate factual determinations. *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002). Among the predicate facts resolved before the agency here were whether there was an actual disruption and the scale of the disruption. The hearing officer found that there was a significant and largely negative response from the community, questioning Hedgepeth's ability to represent the District and function as a teacher; school administrators spent a significant amount of time, in meetings and by phone calls, addressing these concerns; the posts caused significant unrest among current students, parents, coworkers, and the community; caused extra workload for administrators; harmed Hedgepeth's relationship to the community and to District students and parents; and threatened to harm their relationship to the District. [54-3] at 614–17, 632, 634–35, 640. Issue preclusion bars Hedgepeth from relitigating these predicate facts, and they establish that Hedgepeth's posts interfered with the regular operation of the school district. With that, the outcome of the *Pickering* test necessarily follows—as discussed below, the District's interests in efficient provision of its services outweighed Hedgepeth's speech interests. Hedgpeth's speech was not protected by the First Amendment, and she cannot relitigate her First Amendment claim in this court.

### B.    First Amendment Claim

Even if issue preclusion did not bar Hedgepeth from relitigating her First Amendment claim, no material facts are in dispute and summary judgment in favor of defendants on the merits is appropriate. To bring a claim for retaliation under the First Amendment, Hedgepeth must establish that: (1) she engaged in constitutionally protected speech; (2) she suffered a deprivation likely to deter protected speech; and (3) her protected speech was a motivating factor in her termination. *See Harnishfeger v. United States*, 943 F.3d 1105, 1112–13 (7th Cir. 2019). Only the first element is in dispute. [78] ¶ 3.

Whether a government employee's speech is protected under the First Amendment is a question of law that may require "predicate factual determinations." *Gustafson*, 290 F.3d at 906. Hedgepeth must show that she spoke as a private citizen on a matter of public concern. *See Harnishfeger,* 943 F.3d at 1113 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) and *Connick v. Myers*, 461 U.S. 138, 147 (1983)). Defendants do not dispute these two elements, so the burden shifts to them to show that the District's interest as an employer in "promoting the efficiency of the public services it performs" outweighs Hedgepeth's speech interests. *See* [76] at 5; *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 568 (1968). Speech on matters of public concern loses its First Amendment protection if a government employer's management interests outweigh its employee's free-speech interests. *Kristofek v. Village of Orland Hills*, 832 F.3d 785, 795 (7th Cir. 2016).

16

In weighing the competing interests under the *Pickering* balancing inquiry, relevant factors include:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Kristofek*, 832 F.3d at 796 (quoting *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000)). If an employee's speech touches upon a matter of "strong public concern," then the government must show a higher degree of potential or actual disruption to justify the restriction. *See Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1119 (7th Cir. 2013); *see also Waters v. Churchill*, 511 U.S. 661, 673 (1994) (noting that a court may give "substantial weight to government employers' reasonable predictions of disruption"). On the other hand, "the less serious, portentous, political, significant the genre of expression," the less demanding the showing that the government must make. *Eberhardt v. O'Malley*, 17 F.3d 1023, 1026 (7th Cir. 1994). The extent of an employee's authority and interactions with the public also bears on the degree of government interest in preventing disruption. *See Rankin v. McPherson*, 483 U.S. 378, 392 (1987) (holding that the government's interest in discharging a low-level employee did not outweigh her speech interests where the employee's position was limited to clerical work and did not involve law enforcement activity). Special consideration is given in the context of school-employee speech by virtue of the position of trust that a teacher in a public school occupies. *See Craig*, 736 F.3d at 1119

17

(noting that the employee's position as a public school counselor working closely with students involved "an inordinate amount of trust and authority"); *see also Melzer v. Bd. of Educ. of the City Sch. Dist. of the City of New York*, 336 F.3d 185, 198 (2d Cir. 2003) (recognizing that a public school teacher's "position by its very nature requires a degree of public trust not found in many other positions of public employment" so disruption caused by a teacher's speech can warrant discipline action against the teacher).

Even when viewing the undisputed facts in the light most favorable to Hedgepeth, defendants' interest in addressing the disruption caused by her Facebook posts outweighed her speech interests. Hedgepeth's three Facebook posts, though varying in content and form, clearly touched on a matter of public concern—political unrest and race in the wake of police violence. *See Connick,* 461 U.S. at 147–48 (looking to the "content, form, and context of a given statement, as revealed by the whole record" to determine whether speech addresses a matter of public concern). While Hedgepeth's speech satisfies this threshold to reach *Pickering* balancing, it does not rise to the level of public-employee speech that warrants a stronger showing of disruption by the government. Public-employee speech may hold "special value" because the employee "gain[s] knowledge of matters of public concern through their employment." *Lane v. Franks*, 573 U.S. 228, 240 (2014). For example, a government employee who reports misconduct or exposes corruption is well-situated to bring those issues to light, and the public's interest in receiving that information is particularly strong. *See Garcetti*, 547 U.S. at 425. Although it involved politically salient issues,

Hedgepeth's speech does not afford it special weight. I accept her characterization of the posts: (1) the "civil war" post where she commented "I need a gun and training" was a reference to political division and personal safety concerns; (2) the "Wanna Stop the Riots?" post was satirical rather than a literal call for violence against protesters, and (3) the exchange with the former student about the term "white privilege" was informed by Black conservative thought and supported by statistics. [68] at 13–17. None of this suggests that Hedgepeth's speech was informed by specialized knowledge gained through her public employment or that she was offering novel commentary to the fraught political moment. Her chosen genre and medium of expression—hyperbolic or satirical social media posts and a back-and-forth discussion with a friend—are toward the less serious, less significant end of the spectrum of works of public commentary. In her own telling, she was joking and otherwise sharing the views of others. Her speech was on a matter of public concern, but it was not the type of public-employee speech that demands "particularly convincing reasons" by defendants to justify its restriction. *See Gustafson v. Jones*, 117 F.3d 1015, 1019 (7th Cir. 1997).

Both parties dispute the importance of Hedgepeth's post being shared on her personal Facebook page and whether she flouted district policy by accepting Facebook friend requests from former students. [68] at 17; [76] at 7–8. Hedgepeth was on vacation and her profile did not expressly identify her as a Palatine High School teacher. [69] ¶ 21; [78] ¶ 2. Speech made outside of the workplace may be less disruptive to the "efficient functioning of the office." *See Rankin*, 483 U.S. at 388–89.

19

On the other hand, posting on a social media platform carries the risk of amplification. *See Liverman v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016) ("A social media platform amplifies the distribution of the speaker's message—which favors the employee's free speech interests—but also increases the potential, in some cases exponentially, for departmental disruption, thereby favoring the employer's interest in efficiency."). Unlike the government employee in *Harnishfeger*, nobody leaked Hedgepeth's posts through extensive digging. *See Harnishfeger*, 943 F.3d at 1118. Hedgepeth admits that she accepted friend requests from former students. [78] ¶ 23. The parties dispute whether it was formal district policy that teachers were instructed to unfriend former students with younger siblings still attending a school or if this was a "mere suggestion." [69] ¶ 10. Even in drawing this inference in favor of Hedgepeth, it is undisputed that her posts had their own momentum to reach a wide audience, including District 211 constituents, and reflected on the public's perception of Hedgepeth as a teacher. *See* [69] ¶ 48; [54-3] at 8–275.

Hedgepeth devotes much of her briefing to assert that her posts were not racist. Regarding the third post, she offers expert testimony to support her point that her comments were influenced by Black scholars who have made similar assertions. [68] at 15–16; [69-6] at 39–65. She argues that her comments about "Black genocide" were supported by statistics of the "Black murder rate and Black abortion rate."[13] [68] at

---

[13] Hedgepeth also argues that defendants made no effort to verify the truth of her statements in the third post, so the defendants do not meet their burden under *Pickering*. [68] at 16. But defendants did not pursue Hedgepeth's dismissal based on a belief that her posts were false. [76] at 12. False speech or speech made with reckless disregard of the truth is not entitled to First Amendment protection, but that does not mean the government must establish the

15. But the other side of *Pickering* balancing weighs the government's legitimate interest in minimizing disruption, and Hedgepeth's intent and meaning behind her posts do not diminish the impact of her speech on the District's operations. After all, a public employee must also "by necessity… accept certain limitations on his or her freedom" when entering public service. *Garcetti*, 547 U.S. at 418.

Defendants offer ample undisputed evidence of actual disruption caused by Hedgepeth's Facebook posts.[14] By the time the Board voted to dismiss Hedgepeth in July, the District had received 113 emails about her posts. [69] ¶ 48; [69-7] at 68. The record contains many examples of students and parents expressing concern about Hedgepeth's fitness as a teacher. In an email to Board Member Cavill, students shared that "[a]s students of color, we feel angered by Ms. Hedgepeth's statements and feel that she should no longer have a place as staff at PHS… We don't want a teacher at Palatine who believes we are being dramatic when a racist act has been done against us. We want a teacher who understands what we are going through and how the obstacles presented to us for simply being of different color." [54-3] at 26–28.

---

falsity of her statements in order to prevail under *Pickering* balancing. *See Greer v. Amesqua*, 212 F.3d 358, 373 (7th Cir. 2000) (internal citation omitted) ("Recklessly false statements by a public employee enjoy no First Amendment protection, and from this principle Greer wrongly extrapolates that speech which is factually true therefore must be absolutely protected. However, we have never held that an employer must prove the falsehood of the employee's statement before disciplining the employee based on that speech.")

[14] Hedgepeth attempts to impose a limitation on when defendants' claim of disruption can be "measured." [68] at 21–22. She argues that disruption must be measured only up until Small's recommendation to the Board for Hedgepeth's dismissal. *Pickering* balancing prohibits consideration of "hypothetical concerns that a governmental employer never expressed." *See Harnishfeger,* 943 F.3d at 1116. Instead, I must look to what the District's concerns "really were." *Id.* But the events leading up to the Board's decision to dismiss Hedgepeth were not hypothetical and are relevant to the assessment of actual disruption that defendants were responding to.

One email by a parent urged a response by the District: "I don't believe Hedgepeth is the only teacher with the same beliefs. I hope that there will be anti bias training, discrimination training, diversity speakers for teachers and students." [54-3] at 73–74. Another parent email expressed concern that Hedgepeth's post about the civil war and needing a gun was "very alarming" and that she was unclear on whether the post "was meant to intimidate those with views different than her, or if it was mean [sic] to encourage others to be violent." [54-3] at 86–89. The posts also attracted media attention and prompted the District to issue a press statement. [69] ¶ 29; [54-2] at 542–48.

Defendants' actions to dismiss Hedgepeth based on public reaction to her speech did not amount to a "heckler's veto." The First Amendment generally prohibits the suppression of unpopular speech because of audience reaction; but in this context, students and parents are not a mere audience. *See Melzer*, 336 F.3d at 199. The concerns raised by students and parents regarding Hedgepeth's role as a teacher were a reasonable consideration for the District. Students and parents are not "outsiders" attempting to silence speech, but "participants in public education, without whose cooperation public education as a practical matter cannot function." *Id*. Hedgepeth notes that the community reaction included comments in support of her. *See, e.g.*, [54-3] at 13–16. But support expressed in Hedgepeth's favor does not negate the District's justification in responding to criticism and feedback. *See Melzer*, 336 F.3d at 198 ("It is true that some parents and students expressed support for Melzer as a person harmlessly expressing his ideas. It is nonetheless entirely reasonable for the Board

to believe that many parents and students had a strong negative reaction to him, and that such a reaction caused the school to suffer severe internal disruption.").

Hedgepeth also makes a variety of objections about the scale of the disruption; the fact that many comments were made by general members of the public rather than parents or teachers; and that some of the emails sent to the District were based on form templates. [68] at 22–24. Hedgepeth may dispute defendants' characterization of the comments, but she does not dispute, for example, that the district received 113 emails related to her Facebook posts or that 44 public comments submitted to the June board meeting expressed criticism of her. [69] ¶ 27; [69-7] at 68, 71–72. While the concerns of parents and teachers are particularly relevant to weighing a school district's interest in restricting teacher speech, comments raised by members of the public are not irrelevant. The government's interest in maintaining public perception is an inherent part of its operations. *See Rankin*, 438 U.S. at 390–391; *see also Locurto v. Giuliani*, 447 F.3d 159, 178 (2d Cir. 2006) (finding that the government may "legitimately regard as 'disruptive' expressive activities that instantiate or perpetuate a widespread public perception of police officers and firefighters as racist"). Nor does the fact that some of the emails sent to the District were based on recycled language suggest that the disruption was in fact minimal or overblown. The bottom line is that the District was forced to divert resources from the normal operations of school services to address Hedgepeth's posts.

Some of the defendants expressed personal opinions disapproving of her speech, so Hedgepeth argues that the District's justifications for her dismissal are

23

pretextual. [68] at 26–28. Defendants do not dispute that Superintendent Small, for example, was "appalled" by Hedgepeth's speech. [78] ¶ 52. Board member Cavill commented that the third post invoked "racial stereotypes and racial tropes." [78] ¶ 52. Whether individual defendants viewed Hedgepeth's speech as inflammatory or racist does not diminish the evidence in the record that external complaints about her speech amounted to significant disruption.

Hedgepeth argues that defendants do not show that her speech actually interfered with her job performance. [68] at 19. A government employer is not required to show actual interference with an employee's ability to perform her job duties to prevail under *Pickering* balancing, but the assessment must be reasonable and supported by evidence rather than "mere speculation." *See Craig*, 736 F.3d at 1119. The concerns expressed by community members constituted actual disruption, but it also provided a reasonable basis for defendants to conclude that Hedgepeth's ability to perform her responsibilities as a teacher was compromised. These concerns touched on her ability to be unbiased in her role as a teacher, particularly to students of color. *See, e.g.,* [54-3] at 53 (email by family member of a current PHS student), 73 (email by parent of current student in Hedgepeth's homeroom class). Administrators also shared this concern. In recommending Hedgepeth's dismissal to Small and Britton, Principal Medina raised his concern about Hedgepeth's posts negatively reflecting on her ability to be an effective teacher and build "a trusting relationship with students" given the "substantial minority population" at the school. [54-3] at 2–3. He also based this concern on her past conduct "involving intemperate outbursts

24

in the presence of students." [54-3] at 2. Small's recommendation of dismissal to the Board was based on her view that the "overwhelming negative response to Hedgepeth's posts made it clear that many students would not feel that they could safely voice their opinions regarding sensitive subjects such as race in Hedgepeth's classroom." [54-2] at 482. Moreover, the District's assessment about Hedgepeth's ability to perform her duties was also reasonably informed by her prior disciplinary history, which included, among other things, unprofessional conduct violating district policy while speaking to students. [54-2] at 202–04, 206–08. In Hedgepeth's case, there was also an investigation and dismissal hearing regarding her fitness as a teacher, violation of district policies, and ability to continue in the role. *See Bennett v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*, 977 F.3d 530, 544 (6th Cir. 2020) ("There is no precedent requiring further disruption to an office environment once the government confirms violations of policy and ascertained disruption."); *see also Fenico v. City of Philadelphia*, 70 F.4th 151, 168 (3d Cir. 2023) (noting deference to "employers' reasonable interpretations of employee speech and predictions of disruption" especially where an internal investigation into the conduct has occurred). The Board's judgment about Hedgepeth's compromised ability to perform her role as a teacher was not based on mere generalizations or speculation but actual concerns reflected in the comments and inquiries that the District received. All of these factors taken together constituted a reasonable basis for her dismissal. *See Craig*, 736 F.3d

at 1120 (finding the school district "reasonably predicted" that plaintiff's book would cause apprehension among female students in seeking his help as a counselor).[15]

Undisputed facts in the record show that Hedgepeth's posts caused significant disruption to the District's operations. The posts interfered with operations by diverting resources to field the concerns raised by parents, teachers, community members, and administrators; and those concerns also reasonably informed the prediction that Hedgepeth had compromised her ability to do the job. Those management interests outweighed Hedgepeth's speech interests as a matter of law under *Pickering*. Defendants did not violate plaintiff's First Amendment rights by dismissing her.

### C. Qualified Immunity

Defendants also move for summary judgment on a qualified immunity defense. [53] at 14–15. Qualified immunity protects government officials who "make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Government officials are entitled to qualified immunity unless their conduct violated a constitutional right that was "clearly established" at the time. *See Tousis v. Billiot*, 84 F.4th 692, 697 (7th Cir. 2023). In the context of *Pickering* balancing where "a wide gray area between the clearly legal and the clearly

---

[15] Defendants also point to Hedgepeth's speech impairing her ability to maintain close working relationships with her colleagues. [53] at 12. They do not identify facts properly supported in the record to show that Hedgepeth's speech was disruptive to the District's interest in maintaining harmony among co-workers, so I find this justification to be unsupported for purposes of summary judgment.

illegal" exists, an official is afforded the "the benefit of the doubt" if a case falls within the gray area. *Gustafson*, 117 F.3d at 1021.

Unlike the defendants in *Harnishfeger* or *Gustafson* who terminated an employee based on speech that neither caused actual disruption nor supported a reasonable belief about potential disruption, the undisputed record here shows that the Board's dismissal of Hedgepeth was based on evidence of actual disruption *See Harnishfeger,* 943 F.3d at 1121; *Gustafson*, 290 F.3d at 913. There may be grounds for debate over the amount of disruption caused by and the value of Hedgepeth's speech, but any mistake in the balancing would be reasonable. Hedgepeth has not demonstrated that the Board's *Pickering* analysis was plainly incompetent or a knowing violation of the law. *See Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 988 (7th Cir. 2021) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law") (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The individual defendants are entitled to summary judgment based on qualified immunity.

## IV.    Conclusion

Plaintiff's First Amendment claim is barred by issue preclusion. In the alternative, defendants did not violate plaintiff's First Amendment rights and the individual defendants are entitled to qualified immunity. Defendants' motion for summary judgment, [52], is granted and plaintiff's cross-motion for summary judgment, [55], is denied. Enter judgment in favor of defendants and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: February 20, 2024

28